**No. 25-40583**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,**

*Plaintiff - Appellee,*

**v.**

**ERICSSON INCORPORATED; ERICSSON AB;
TELEFONAKTIEBOLAGET LM ERICSSON; BORJE ECKHOLM,**

*Defendants/Counter-Claimants - Appellants,*

**v.**

**ACE AMERICAN INSURANCE COMPANY,**

*Counter-Defendant - Appellee.*

**On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
Case No. 4:23-cv-1068-ALM, Judge Amos L. Mazzant**

**BRIEF OF APPELLANTS**

Ernest Martin, Jr.
 *Ernest.Martin@haynesboone.com*
Michael F. Qian
 *Michael.Qian@haynesboone.com*
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Phone: (214) 651-5000

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Case Number and Style**: 25-40583, *Travelers Property Casualty Company of America v. Ericsson Incorporated; Ericsson AB; Telefonaktiebolaget LM Ericsson; Borje Eckholm v. ACE American Insurance Company*

I. **Defendants/Counter-Claimants/Counter-Defendants - Appellants**

- **Ericsson Incorporated;**
- **Ericsson AB;**
- **Telefonaktiebolaget LM Ericsson;**
- **Börje Ekholm**[1]

<u>Appellate and Trial Counsel</u>

Ernest Martin, Jr.
  *Ernest.Martin@haynesboone.com*
Michael F. Qian
  *Michael.Qian@haynesboone.com*
Haynes and Boone, LLP
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Tel. (214) 651-5000

---

[1] As the district court noted: The original complaint, and therefore the case caption, uses the spelling "Eckholm," but the correct spelling of the defendant's name is "Ekholm." ROA.8466 (Mem. Op. & Order).

Trial Counsel

Adrian Azer
 *Adrian.Azer@haynesboone.com*
HAYNES AND BOONE, LLP
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Tel. (214) 651-5000

Other Interested Persons

Ericsson Inc. is a Delaware corporation that is wholly owned by Ericsson Holding II Inc., which is also a Delaware corporation. Ericsson Holding II Inc. is wholly owned by Telefonaktiebolaget LM Ericsson ("LM Ericsson").

Ericsson AB is organized under the laws of Sweden and is wholly owned by LM Ericsson.

LM Ericsson is publicly held and has no parent corporation. LM Ericsson has Class A and Class B shares that are listed on Nasdaq Stockholm in Sweden. In the United States, the Class B shares are listed on Nasdaq New York in the form of American Depositary Shares (ADS) evidenced by American Depositary Receipts (ADR). Each ADS represents one Class B share. No publicly held corporation owns 10% or more of LM Ericsson's stock, which comprises Class A and Class B shares. However, as of December 31, 2024, Investor AB and AB Industrivärden each own shares in LM Ericsson representing 10% or more of the voting rights.

## II.    Plaintiff/Counter-Defendant - Appellee

- **Travelers Property Casualty Company of America**

    <u>Appellate and Trial Counsel</u>

    James Stephen Barrick
      *sbarrick@hicks-thomas.com*
    Courtney Elizabeth Ervin
      *cervin@hicks-thomas.com*
    Stacie Jean Osborn
      *sosborn@hicks-thomas.com*
    HICKS THOMAS LLP
    700 Louisiana Street, Suite 2300
    Houston, Texas 77002
    Tel. (713) 547-9100

    <u>Trial Counsel</u>

    ANTONELLI, HARRINGTON & THOMPSON LLP
    4306 Yoakum Blvd., Suite 450
    Houston, Texas 77006
    Tel. (713) 547-9167

    <u>Other Interested Persons</u>

    According to Travelers Property Casualty Company of Americas' Rule 7.1 Disclosure Statement in the district court (ROA.847):

    "Travelers Property Casualty Company of America is a citizen of the State of Connecticut and is 100% owned by The Phoenix Insurance Company, which is 100% owned by The Travelers Indemnity Company, which is 100% owned by Travelers Insurance Group Holdings, Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family (collectively 'Travelers'). No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc."

iv

## III.   Counter-Defendant/Counter-Claimant - Appellee

- **ACE American Insurance Company**

  Appellate and Trial Counsel

  Manuel Mungia
   *manuel.mungia@nortonrosefulbright.com*
  NORTON ROSE FULBRIGHT US LLP
  111 W. Houston Street, Suite 1800
  San Antonio, Texas 78205
  Tel. (210) 270-7022

  Chad Schreiber
   *chad.schreiber@nortonrosefulbright.com*
  Jeannie Nguyen
   *jeannie.nguyen@nortonrosefulbright.com*
  NORTON ROSE FULBRIGHT US LLP
  1550 Lamar Street, Suite 2000
  Houston, Texas 77010
  Tel. (713) 651-5151

  Other Interested Persons

  According to ACE American Insurance Company's Rule 7.1 Disclosure Statement in the district court (ROA.2446):

  "ACE American Insurance Company is a wholly owned subsidiary of INA Holdings Corporation, which is a wholly owned subsidiary of INA Financial Corporation. INA Financial Corporation is a wholly owned subsidiary of INA Corporation, which is a wholly owned subsidiary of Chubb INA Holdings LLC. Chubb INA Holdings LLC is owned 80.62% by Chubb Group Holdings Inc. and 19.38% by Chubb Limited. Chubb Group Holdings Inc. is a wholly owned subsidiary of Chubb Limited. Chubb Limited (NYSE: CB) is the only publicly traded company holding more than a 10% ownership interest in ACE American Insurance Company."

Dated: December 23, 2025

/s/ Ernest Martin, Jr.
Ernest Martin, Jr.
**Attorney of Record for Defendants/Counter-Claimants/Counter-Defendants/Appellants Ericsson Incorporated, Ericsson AB, Telefonaktiebolaget LM Ericsson, and Börje Ekholm**

vi

## STATEMENT REGARDING ORAL ARGUMENT

Appellants Ericsson Incorporated, Ericsson AB, Telefonaktiebolaget LM Ericsson, and Börje Ekholm (collectively, "Ericsson") respectfully request oral argument. This case concerns widely used insurance-policy terms. In denying coverage here, the district court misapprehended legal principles governing a broad range of policyholders and insurers. Oral argument may aid the Court in resolving these important issues.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................vii

TABLE OF CONTENTS ...................................................................................viii

TABLE OF AUTHORITIES ..................................................................................x

ABBREVIATIONS AND RECORD REFERENCES ...........................................xiii

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF ISSUE PRESENTED .................................................................2

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE ...............................................................................5

      A.    The Insurers issued liability insurance to Ericsson promising to defend against any suit for injuries caused by an "accident." ...............................................................................5

      B.    Ericsson was sued for attacks perpetrated by foreign terrorist organizations—with scattershot allegations about Ericsson's supposed role and intent. ...................................... 6

      C.    The Insurers denied coverage and initiated this lawsuit. ...................10

      D.    The district court held the Insurers owe no duty to defend by treating allegations of non-accidental conduct as dispositive. ........................................................................... 11

SUMMARY OF THE ARGUMENT ....................................................................12

STANDARD OF REVIEW .................................................................................14

ARGUMENT.....................................................................................................14

I.    Under Texas law, the Underlying Suits fall within the duty to defend if any complaint allegation potentially shows injury caused accidentally from Ericsson's standpoint. ..........................................14

A.     Texas law imposes a broad duty to defend, triggered by even one potentially covered allegation. .............................. 14

B.     An "accident" is a fortuitous, unexpected, and unintended event from the insured's standpoint. ............................. 17

II.    The district court failed to apply the rule that any factual allegation of accidental injury is enough to trigger the duty to defend. ................................................................................. 20

III.   Properly analyzed, the complaints here contain allegations that Ericsson caused injury by "accident." ......................................... 23

A.     The complaints contain allegations that Ericsson did not act intentionally and voluntarily in causing the injuries. .................... 25

B.     The complaints contain allegations of injuries that were not the natural and probable consequence of Ericsson's acts. ................................................................................. 33

CONCLUSION AND PRAYER ....................................................... 38

CERTIFICATE OF SERVICE ....................................................... 40

ECF CERTIFICATION ............................................................... 40

CERTIFICATE OF COMPLIANCE ................................................ 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceptance Ins. v. Lifecare Corp.*,
89 S.W.3d 773 (Tex. App.—Corpus Christi 2002, no pet.) ............................... 25

*City of Coll. Station v. Star Ins.*,
735 F.3d 332 (5th Cir. 2013) ................................................................... 16

*Discover Prop. & Cas. Ins. v. Blue Bell Creameries USA, Inc.*,
73 F.4th 322 (5th Cir. 2023) ...................................... 25, 26, 31, 32, 37

*Frederking v. Cincinnati Ins.*,
929 F.3d 195 (5th Cir. 2019) ........................ 17, 18, 24, 26, 32, 33, 34, 35, 36, 38

*Gore Design Completions, Ltd. v. Hartford Fire Ins.*,
538 F.3d 365 (5th Cir. 2008) ................................................... 14, 15, 21

*GuideOne Elite Ins. v. Fielder Rd. Baptist Church*,
197 S.W.3d 305 (Tex. 2006) ............................................................. 10

*Harken Expl. Co. v. Sphere Drake Ins.*,
261 F.3d 466 (5th Cir. 2001) .................................................... 19, 35

*King v. Dall. Fire Ins.*,
85 S.W.3d 185 (Tex. 2002) ..................................... 15, 18, 22, 23, 24, 25, 26, 32

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
242 S.W.3d 1 (Tex. 2007) ............................................... 17, 18, 22, 34

*Landry's, Inc. v. Ins. Co. of the State of Pa.*,
4 F.4th 366 (5th Cir. 2021) ....................................... 17, 19, 20, 21, 22, 23, 25, 38

*Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*,
903 F.3d 435 (5th Cir. 2018) ................................................ 15, 16, 21

*Mid-Century Ins. v. Lindsey*,
997 S.W.2d 153 (Tex. 1999) ............................................... 33, 36, 37

x

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
  53 F.4th 869 (5th Cir. 2022) ..................................................................... 14

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*,
  532 F.3d 398 (5th Cir. 2008) .................................................................... 18

*Penn-Am. Ins. v. Tarango Trucking*, L.L.C.,
  30 F.4th 440 (5th Cir. 2022) ..................................................................... 14

*Ramsay v. Maryland Am. Gen. Ins.*,
  533 S.W.2d 344 (Tex. 1976) ..................................................................... 15

*Republic Nat'l Life Ins. v. Heyward*,
  536 S.W.2d 549 (Tex. 1976) ..................................................................... 19

*Rusk State Hosp. v. Black*,
  392 S.W.3d 88 (Tex. 2012) ....................................................................... 18

*St. Paul Fire & Marine Ins. v. Green Tree Fin. Corp.-Tex.*,
  249 F.3d 389 (5th Cir. 2001) .................................................................... 16

*St. Paul Ins. v. Tex. Dep't of Transp.*,
  999 S.W.2d 881 (Tex. App.—Austin 1999, pet. denied) .................................. 16

*State Farm Fire & Cas. Co. v. S.S.*,
  858 S.W.2d 374 (Tex. 1993) ................................................................17, 18

*Superior Ins. v. Jenkins*,
  358 S.W.2d 243 (Tex. App.—Eastland 1962, writ ref'd n.r.e.) .................... 19, 23

*Tri-Coastal Contractors, Inc. v. Hartford Underwriters Ins.*,
  981 S.W.2d 861 (Tex. App.—Houston [1st Dist.] 1998,
  pet. denied) ........................................................................................... 15

*Trinity Universal Ins. v. Cowan*,
  945 S.W.2d 819 (Tex. 1997) ................................................................. 34, 35

*Wessinger v. Fire Ins. Exch.*,
  949 S.W.2d 834 (Tex. App.—Dallas 1997, no writ) ................... 17, 18, 19, 25, 26

*Zurich Am. Ins. v. Nokia, Inc.*,
  268 S.W.3d 487 (Tex. 2008) ...................................... 5, 15, 16, 17, 19, 21, 23

**Statutes**

18 U.S.C. § 2333 ........................................................................... 6, 29

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1332 ................................................................................ 1

**Other Authorities**

Fed. R. Civ. P. 54(b) ..................................................................... 1, 11

## ABBREVIATIONS AND RECORD REFERENCES

"Ericsson" means Appellants Ericsson Incorporated, Ericsson AB, Telefonaktiebolaget LM Ericsson, and Börje Ekholm.

"FTOs" and "foreign terrorist organizations" means organizations that have been designated as "foreign terrorist organization[s]" by the Secretary of State, as described in 8 U.S.C. §1189 and 18 U.S.C. §2333(d)(2).

"The Insurers" means Appellees Travelers Property Casualty Company of America and ACE American Insurance Company.

"Underlying Suits" means *Schmitz v. Ericsson Inc.*, No. 1:22-cv-02317 (D.D.C.), and *Wirtz v. Ericsson Inc.*, No. 1:24-cv-00514 (D.D.C.).

"ROA.[#]" means the Record on Appeal at that page number.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §1332, and this Court has jurisdiction under 28 U.S.C. §1291. On September 23, 2025, the district court directed entry of partial final judgment under Federal Rule of Civil Procedure 54(b) on its grant of partial summary judgment in favor of Travelers Property Casualty Company of America and ACE American Insurance Company (collectively, "the Insurers") on their claims regarding the duty to defend and its dismissal with prejudice of Ericsson's related counterclaims. On September 25, 2025, Ericsson timely filed an amended notice of appeal from that judgment.

## STATEMENT OF ISSUE PRESENTED

Ericsson purchased insurance for defense against lawsuits involving injuries caused by an "accident" from the standpoint of the insured. Ericsson was sued for allegedly causing terrorist attacks indirectly—including by being unaware and indifferent regarding whether its business dealings with third parties would ultimately benefit designated foreign terrorist organizations. The issue presented is:

Do those complaints contain allegations potentially establishing an "accident" from Ericsson's standpoint within the duty to defend?

## INTRODUCTION

Businesses get sued for harm they did not anticipate—or did not cause at all. To manage the risk of costly litigation, they buy liability insurance. In a standard commercial general liability policy, the insurer agrees to pay not only any ultimate judgment, but also the costs of defending the lawsuit—to help defeat unfounded claims in the first place.

This duty to defend is broad under Texas insurance law. Courts must resolve doubts in favor of coverage. If any allegation in the underlying complaint is even potentially covered by the insurance policy, the insurer must defend against the entire lawsuit. After all, the point of the insurance is to protect against litigation risk, which can be costly even for entirely baseless claims.

This case concerns Ericsson's attempts to enforce insurance coverage for two such lawsuits. Those suits seek damages from Ericsson, a global telecommunications company and its subsidiaries, for injuries inflicted by Al-Qaeda, ISIS, and other terrorists. Ericsson unequivocally condemns the acts of terrorism that caused the plaintiffs' tragic injuries. But Ericsson had nothing to do with those attacks.

Ericsson of course did not intentionally inflict injuries on these plaintiffs in these terrorist attacks. And the lawsuits do not claim Ericsson did. Instead, the lawsuits float myriad theories—across thousands of paragraphs of allegations—for

3

how Ericsson's business activities supposedly might have benefitted designated foreign terrorist organizations. The complaints rest on work by an Ericsson subsidiary in Iraq and Afghanistan to provide critical telecommunications access during a time of instability. The complaints allege that, through layers of third-party contractors and customers, Ericsson's resources indirectly reached designated foreign terrorist organizations, which committed certain attacks. Alongside far-fetched assertions of intentional support, the complaints also allege that Ericsson did not know its resources would ultimately land in designated foreign terrorist organizations' hands. Under those allegations, the injuries were inadvertent from Ericsson's standpoint.

Ericsson is defending itself against these unfounded accusations. And Ericsson bought insurance to cover such costly litigation. Its policies promise a defense for suits like these alleging injuries caused by "accident" from Ericsson's standpoint. Yet Ericsson's insurers refused coverage and sued for a declaration that no duty to defend exists.

The district court, misapplying Texas law, held there was no covered "accident" triggering a duty to defend. It found allegations of non-covered conduct in the complaints and treated them as dispositive, disregarding covered allegations.

That was reversible error. Under Texas law, any potentially covered allegation is enough. Other, uncovered allegations do not defeat the duty to defend.

Losing sight of that rule, the district court disregarded allegations showing that, from Ericsson's standpoint, any supposed connection between its operations and these terrorist attacks was fortuitous, unintended, and unexpected. Any one of those allegations makes the injuries accidental and therefore within the duty to defend. The judgment negating the Insurers' duty to defend should be vacated.

## STATEMENT OF THE CASE

### A. The Insurers issued liability insurance to Ericsson promising to defend against any suit for injuries caused by an "accident."

Under a standard commercial general liability insurance policy, "[i]n exchange for premiums paid," the insurer promises to defend the insured against litigation seeking covered damages (and, separately, to indemnify against any liability). *Zurich Am. Ins. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008). That duty to defend is broad: The "insurer must defend its insured" if the lawsuit's "allegations potentially support a covered claim," regardless of whether the insured turns out to be liable. *Id.*

Ericsson purchased such insurance coverage from the Insurers. ROA.8474 (Mem. Op. & Order); ROA.7381-84 (Joint Stipulation). Under the policies, the Insurers have the "duty to defend the insured against any 'suit' seeking" any

5

"damages because of 'bodily injury'" that is "caused by an 'occurrence.'" ROA.8474; ROA.7382-84. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." ROA.8474; ROA.7383.

>     **B.    Ericsson was sued for attacks perpetrated by foreign terrorist organizations—with scattershot allegations about Ericsson's supposed role and intent.**

In 2022 and 2024, two groups of plaintiffs sued Ericsson for damages in the U.S. District Court for the District of Columbia ("the Underlying Suits"). *See Schmitz v. Ericsson Inc.*, No. 1:22-cv-02317 (D.D.C.); *Wirtz v. Ericsson Inc.*, No. 1:24-cv-00514 (D.D.C.). Plaintiffs are American victims (and their families) of terrorist attacks between 2005 and 2021 in Afghanistan, Iraq, Syria, Turkey, France, and Niger. ROA.5809 (¶1) (*Schmitz* operative complaint); ROA.6616, 7076 (¶¶1, 1242) (*Wirtz* operative complaint). Although the attacks were perpetrated by designated foreign terrorist organizations ("FTOs"), the plaintiffs sued Ericsson for damages. They claim Ericsson is liable under the Anti-Terrorism Act, 18 U.S.C. §2333, for either allegedly aiding and abetting the attacks or allegedly providing material support to the FTOs. ROA.5818, 6581-82 (¶¶24, 3935); ROA.6625, 7253-54 (¶¶24, 2678). As relevant here, both complaints' allegations are substantially similar.

6

Each complaint spans hundreds of pages and thousands of paragraphs. ROA.5773-6588; ROA.6590-7260. The complaints raise sprawling theories and allegations trying (baselessly) to tie the attacks to Ericsson's business operations.

Many allegations revolve around the notion that designated foreign terrorist organizations indirectly received resources as a result of Ericsson doing business with third parties in the region. The complaints allege that "conducting business as usual" in regions with terrorist activity was a "depraved choice" that made it "more likely than not" that Ericsson resources ended up with terrorist organizations. ROA.5931 (¶371); ROA.6737 (¶370). For example, the complaints allege that Ericsson worked with local subcontractors (which in turn hired other sub-subcontractors) in connection with building telecommunications infrastructure. *See, e.g.*, ROA.5868-69 (¶203); ROA.6674-75 (¶202). Allegedly, the sub-subcontractors made payments (such as vehicle tolls at border crossings) that ended up in foreign terrorist organizations' hands. *See, e.g.*, ROA.5871 (¶212); ROA.6677 (¶211). According to the complaints, alleged toll payments like these amounted to "protection payments" to FTOs.

The complaints allege that there were "as many as five different companies in the contracting chain" separating Ericsson from the foreign terrorist organizations. ROA.5868-69 (¶203); ROA.6674-75 (¶202). According to the complaints:

> [A] prime contractor … (e.g., Ericsson AB), would interface with the customer … to facilitate large-scale contracts …; the prime contractor would then outsource … to a partner (including its customer) or a subcontractor; the partner or subcontractor would hire another partner or subcontractor, which would hire another in turn; and eventually some local company would perform the work on the ground on the prime contractor's behalf.

ROA.5868-69 (¶203); ROA.6674-75 (¶202). It was "the final subcontractor" in this chain that allegedly made payments to designated foreign terrorist organizations. ROA.5869 (¶203); ROA.6675 (¶202).

The complaints attempt various theories about Ericsson's intent. In some places, the complaints assert (conclusorily and implausibly) that Ericsson knew or intended that the proceeds of indirect payments would be received by designated foreign terrorist organizations. But elsewhere, the complaints raise alternative theories that Ericsson acted "indifferent[ly]" or "recklessly" toward the downstream terrorist-financing risks of its business. *E.g.*, ROA.5817, 5903, 5940, 5972 (¶¶22, 295(d), 391(c), 489); ROA.6624, 6709, 6746, 6778 (¶¶22, 294(d), 390(c), 488). Some of these allegations are even closer to negligence than recklessness.

For example, the complaints allege that Ericsson hired a local shipping and logistics subcontractor to transport cell-tower materials within Iraq, and the subcontractor allegedly paid "customs taxes" to "local militias," including a foreign terrorist organization. ROA.5918-20 (¶¶348-50); ROA.6724-26 (¶¶347-49). The

8

complaints allege that, from Ericsson's standpoint, "it cannot be excluded that" the transportation contractor ended up engaging in "potential illicit financing of terrorism to carry out transportation operations for Ericsson." ROA.5920 (¶351); ROA.6726 (¶350); *see* ROA.5880 (¶238) (alleging Ericsson "knowingly (*or recklessly*) paid protection money" by hiring local transportation subcontractors (emphasis added)); ROA.6686 (¶237) (same).

Similarly, the complaints allege elsewhere that Ericsson "did not know," and "did not care, where its money went." ROA.5903, 5940 (¶¶295(d), 391(c)); ROA.6709, 6746 (¶¶295(d), 390(c)). They allege Ericsson was "indifferent to the funding consequences of its business." ROA.5940 (¶391(c)); ROA.6746 (¶390(c)); *see also* ROA.5903 (¶295(d)); ROA.6709 (¶295(d)). The complaints even allege that one subsidiary, Ericsson Inc., is traceable to the terrorist attacks simply because it "maintained an office in Washington, D.C." and "leverage[d] Ericsson's U.S. contacts," enabling Ericsson to "land the Iraq work" that allegedly resulted in resources flowing to terrorists. ROA.5974-75 (¶¶495-96); ROA.6780-81 (¶¶494-95).

None of these theories and allegations are well-pled or establish Anti-Terrorism Act liability—which Ericsson is currently arguing in the Underlying Suits. The merits of the complaints—including whether they establish the requisite mental state for Anti-Terrorism Act liability—are before the District Court for the District

9

of Columbia, where Ericsson's motions to dismiss *Schmitz* are pending. *See* Defs.'
Mot. Dismiss Am. Compl. & Börje Ekholm's Mot. Dismiss Am. Compl., *Schmitz v.
Ericsson Inc.*, No. 1:22-cv-02317, ECF Nos. 44, 45 (D.D.C. Mar. 20, 2023); Minute
Order, *Wirtz v. Ericsson Inc.*, No. 1:24-cv-00514 (D.D.C. Mar. 13, 2024) (staying
*Wirtz* pending the *Schmitz* motions to dismiss). Ericsson continues to incur the costs
of defending against those voluminous and unmeritorious allegations.

### C.     The Insurers denied coverage and initiated this lawsuit.

This separate case is about who pays for that defense. Ericsson invoked its
rights under its insurance policies. But the Insurers denied Ericsson's claims.
Instead, one insurer (Travelers) filed this suit in the Eastern District of Texas
seeking declaratory judgments that it owes no duties to defend or indemnify
Ericsson.[2] The other insurer (ACE) later counterclaimed for the same relief.
Ericsson counterclaimed to enforce the Insurers' duty to defend—seeking a
declaratory judgment and claiming breach of contract and violations of the Texas
Insurance Code.

---

[2] The duty to *defend* covers the costs of defending against allegations in litigation; the
"distinct and separate" duty to *indemnify* covers the damages if the claims are
ultimately "meritorious." *GuideOne Elite Ins. v. Fielder Rd. Baptist Church*, 197
S.W.3d 305, 310 (Tex. 2006) (citation omitted).

**D.     The district court held the Insurers owe no duty to defend by treating allegations of non-accidental conduct as dispositive.**

On cross-motions for summary judgment, the district court held that the Insurers had no duty to defend as a matter of law because the Underlying Suits allege no "accident." ROA.8476-77.

The district court reached that conclusion by seizing on allegations that Ericsson made "knowing and intentional payments to FTOs" (*i.e.*, designated foreign terrorist organizations). ROA.8476. The court believed it "must" "[a]ssum[e]" those allegations control and swept aside the complaints' alternative, contrary allegations, including allegations based on merely "reckless conduct." ROA.8476-77. Based on the intentional-conduct allegations, the court concluded that "the injuries are not accidents." ROA.8477.

The court therefore granted summary judgment to the Insurers on the duty to defend and dismissed Ericsson's counterclaims, holding that the Insurers have no duty to defend Ericsson in the Underlying Suits.[3] ROA.8477-79. The court later entered a partial final judgment under Rule 54(b) on those duty-to-defend claims. ROA.8495-96 (Rule 54(b) Order). Ericsson appealed.

---

[3] Separately, and not at issue in this appeal, the district court held that whether the Insurers have a duty to *indemnify* "is not ripe." ROA.8472-73.

## SUMMARY OF THE ARGUMENT

I. Texas law imposes a broad duty to defend. The insurer must defend the entire suit if any factual allegation even potentially falls within insurance coverage. Here, the question is whether the Underlying Suits allege injuries caused by "accident": a fortuitous, unexpected, and unintended event. This is measured from the insured's standpoint; even if a third party inflicted the injury intentionally, that intent is not imputed to the insured. The complaints here thus allege an "accident" if they contain any allegations potentially indicating the injuries were caused fortuitously, not intentionally, from Ericsson's standpoint. One allegation of accidental injury is enough to trigger the duty to defend, regardless of other, non-accident allegations.

II. The district court inverted that rule. It treated non-accident allegations as dispositive and disregarded other allegations. That contravenes Texas law: any accident allegation is enough to trigger the duty to defend.

III. Properly construed, the complaints allege an "accident" in multiple ways. First, they contain allegations that Ericsson is liable despite not intentionally and voluntarily participating in terrorist attacks or making payments to foreign terrorist organizations. The complaints contain allegations that Ericsson acted inadvertently. Those allegations posit that Ericsson was at most indifferent or reckless to

12

downstream terrorist-financing risks of its business operations. For example, the complaints at times allege Ericsson did business with third parties without knowing that those transactions supposedly would (via a chain of third-party relationships) ultimately benefit designated foreign terrorist organizations that carried out attacks. Under those allegations, Ericsson's alleged role in the attacks was unintentional and involuntary. Any one of those allegations is enough to bring the lawsuits within the duty to defend.

Second, even if the alleged conduct were intentional, the injuries are still accidental (and thus covered) if they were not the natural and probable consequence of Ericsson's acts. The complaints contain allegations of this as well. They strain to trace an extraordinary line from terrorist attacks, through a long chain of intervening events and third parties, to Ericsson's alleged business activities far upstream: selling products, hiring contractors, or even just maintaining an office in Washington, D.C. Ericsson's alleged acts were remote—causally, geographically, and temporally. And the complaints themselves contain allegations that Ericsson did not know its acts would allegedly have those far-removed consequences. The alleged injuries were therefore accidental from Ericsson's standpoint and within the Insurers' duty to defend.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment and motions to dismiss *de novo*. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 878 (5th Cir. 2022). "[W]hether an insurer has a duty to defend its insured in an underlying suit" under Texas insurance law is a question of law reviewed *de novo*. *Penn-Am. Ins. v. Tarango Trucking*, L.L.C., 30 F.4th 440, 444 (5th Cir. 2022) (citation omitted).

## ARGUMENT

**I.    Under Texas law, the Underlying Suits fall within the duty to defend if any complaint allegation potentially shows injury caused accidentally from Ericsson's standpoint.**

This appeal concerns whether the Underlying Suits allege injury caused by "accident" (which brings the suits within the Insurers' "duty to defend" under the insurance policies here). ROA.7381-83; ROA.8476-77. Texas law—which undisputedly controls this case[4]—establishes rules governing that standard insurance policy language.

**A.    Texas law imposes a broad duty to defend, triggered by even one potentially covered allegation.**

Texas duty-to-defend law is "very favorable to insureds." *Gore Design Completions, Ltd. v. Hartford Fire Ins.*, 538 F.3d 365, 368 (5th Cir. 2008). This reflects longstanding Texas policy that insurance contracts must be "construed liberally in

---

[4] *See* ROA.7871-72 (Insurers' Joint Mot. Summ. J.); ROA.8475-76.

14

favor of the insured and strictly against the insurer." *Ramsay v. Maryland Am. Gen. Ins.*, 533 S.W.2d 344, 349 (Tex. 1976).

In particular, Texas applies the "eight-corners" rule: to decide whether a lawsuit triggers the duty to defend, courts look to the four corners of the complaint and the four corners of the insurance policy. *Zurich Am. Ins. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008). "It is the factual allegations" in the lawsuit, "not the legal theories, that control." *Gore*, 538 F.3d at 369; *see Nokia*, 268 S.W.3d at 495. And allegations' "truth or falsity" does not matter. *Nokia*, 268 S.W.3d at 491 (citation modified). So "even if the allegations are groundless, false, or fraudulent the insurer is obligated to defend." *Id.*

This approach protects the insured. Its "purpose" is "to preclude an insurance company from refusing to defend an insured based on the lack of merit of the plaintiff's case." *Tri-Coastal Contractors, Inc. v. Hartford Underwriters Ins.*, 981 S.W.2d 861, 863 (Tex. App.—Houston [1st Dist.] 1998, pet. denied).

Texas law thus requires "resolv[ing] all doubts regarding the duty to defend in favor of the duty." *King v. Dall. Fire Ins.,* 85 S.W.3d 185, 187 (Tex. 2002); *see Gore*, 538 F.3d at 369. Courts must read the underlying complaint's allegations "liberally in favor of the insured." *Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435, 445 (5th Cir. 2018) (citation omitted); *see Nokia*, 268 S.W.3d at 491. This includes

"draw[ing] inferences from the [complaint] that may lead to a finding of coverage." *Lyda*, 903 F.3d at 447 (citation omitted). "The insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy." *Id.* at 446; *Nokia*, 268 S.W.3d at 491 (citation modified).

One covered allegation is enough. "If the underlying complaint pleads facts sufficient to create the *potential* of covered liability, the insurer has a duty to defend the *entire* case," "even if some of the injuries alleged are not covered." *City of Coll. Station v. Star Ins.*, 735 F.3d 332, 336 (5th Cir. 2013) (emphases in original). Conversely, to negate the duty to defend, "*all* of the alleged liability" would have to "fall[] outside of the scope of coverage." *Id.* (emphasis in original). "Over-inclusive allegations do not negate the duty to defend; the duty applies if there is a possibility that *any* of the claims might be covered." *Nokia*, 268 S.W.3d at 495-96 (emphasis in original). This is because the insured purchased a complete defense to the litigation, not piecemeal protection on certain issues. *St. Paul Ins. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied); *St. Paul Fire & Marine Ins. v. Green Tree Fin. Corp.-Tex.*, 249 F.3d 389, 391, 395 (5th Cir. 2001); *see* ROA.7382 (policy language guaranteeing insurer will "defend" against the "'suit,'" not just certain claims).

16

In short: "If *any* allegation in the complaint is *even potentially* covered by the policy then the insurer has a duty to defend its insured." *Landry's, Inc. v. Ins. Co. of the State of Pa.*, 4 F.4th 366, 370 (5th Cir. 2021) (emphases in original) (citation omitted); *see Nokia*, 268 S.W.3d at 491.

### B.  An "accident" is a fortuitous, unexpected, and unintended event from the insured's standpoint.

The duty-to-defend issue in this appeal is whether the Underlying Suits allege injury caused by an "accident." That is a standard term in Texas insurance law and undefined in these policies. *See* ROA.7383. Under Texas law, an "accident" is a "fortuitous, unexpected, and unintended event." *Frederking v. Cincinnati Ins.*, 929 F.3d 195, 197 (5th Cir. 2019) (quoting *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007)). After all, the "the very purpose" of insurance is to protect against the known risk of such events. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 377 (Tex. 1993) (citation omitted); *see Lamar Homes*, 242 S.W.3d at 8.

Accordingly, whether an injury was caused by "accident" turns on "whether the injury was intended or fortuitous." *Lamar Homes*, 242 S.W.3d at 9. An injury can be caused by "accident" in either of two ways. First, if "the acts that produced the alleged injuries were committed involuntarily and unintentionally, [the] inquiry stops there because the results of the acts would be accidental." *Wessinger v. Fire Ins. Exch.*, 949 S.W.2d 834, 837 (Tex. App.—Dallas 1997, no writ). Second, even if the

17

conduct is intentional, the injury is accidental if it is "not the natural and probable consequence of" the insured's act. *Id.*; *S.S.*, 858 S.W.2d at 377 (citation omitted); *Frederking*, 929 F.3d at 200. Conversely, there is no "accident" if "'the insured intended the injury'" (including if the acts "constitute an intentional tort," *i.e.*, acts "taken with the specific intent to inflict harm"). *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 402 (5th Cir. 2008) (quoting *Lamar Homes*, 242 S.W.3d at 8-9); *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 99 (Tex. 2012) (defining "intentional tort").

Whether the injury was caused by "accident" is evaluated from "the insured's standpoint." *King*, 85 S.W.3d at 188. If a third party is the one who "directly causes the injury," that actor's "intent is not imputed to the insured." *Id.* at 191-92. What matters is "the insured's view of the injury-triggering event." *Id.* at 189.

For example, if an employer hires, trains, and supervises an employee negligently, and the employee assaults a person, that assault is an "accident" to the employer for insurance purposes. *Id.* at 187-88, 193. Even though the employee acted intentionally, the employer's role in the injury was unintentional. *Id.* By the same principle, even when a homicide is "caused by the intentional acts of" the assailant, it is still "accidental" for insurance purposes if it was "an unexpected and unusual

18

occurrence" from the insured's standpoint. *Republic Nat'l Life Ins. v. Heyward*, 536 S.W.2d 549, 557-58 (Tex. 1976).

*    *    *

Taken together: A covered "accident" exists if a complaint contains "*any* allegation" that "*even potentially*" shows—from the insured's standpoint—either involuntary and unintentional conduct or injuries that were not a natural and probable consequence. *Landry's*, 4 F.4th at 370; *Wessinger*, 949 S.W.2d at 837. One covered allegation suffices. So even if a lawsuit alleges, for instance, that the insured acted "maliciously with subjective and actual awareness" that damage would result, there is still a covered "accident" if the complaint also contains an allegation of inadvertent conduct. *Harken Expl. Co. v. Sphere Drake Ins.*, 261 F.3d 466, 473-74 (5th Cir. 2001); *see also, e.g.*, *Nokia*, 268 S.W.3d at 495-96 (where lawsuit alleged "both intentional conduct" and "negligence," "intentional tort allegations" do not "defeat the duty to defend" because the court cannot "ignore the plaintiffs' other allegations"); *Superior Ins. v. Jenkins*, 358 S.W.2d 243, 244 (Tex. App.—Eastland 1962, writ ref'd n.r.e.) (finding coverage based on "alternative" allegations of "negligence," despite other allegations of "an intentionally caused injury").

19

**II.    The district court failed to apply the rule that any factual allegation of accidental injury is enough to trigger the duty to defend.**

The district court misapprehended Texas law in holding that the Underlying Suits contain no "accident" within the Insurers' duty to defend. ROA.8476-77. The district court reached that holding by treating allegations of non-accidental conduct as dispositive. That assumption contravenes the rule that even one potentially covered allegation is enough to trigger the duty to defend. *See Landry's*, 4 F.4th at 370. That legal error permeated the court's analysis and led it to the incorrect conclusion that the injuries here were not caused by "accident" from Ericsson's standpoint.

Although the court correctly recited the rule that the insurer must defend the entire suit if coverage is found for any part of it (ROA.8476), the court conducted its analysis as if what mattered was whether the complaints contain any *non-covered* (*i.e.*, non-accidental) allegations. The district court held that the alleged injuries here "are not accidents" just because it found some complaint allegations that Ericsson "made knowing and intentional payments to FTOs." ROA.8476. From the outset, the district court believed it "must" "[a]ssum[e]"—from these non-covered allegations—that the "payments were intentional and resulted in injuries." ROA.8476. Throughout its analysis, the court took as a given that Ericsson intentionally paid FTOs. ROA.8476-77 ("Defendants allegedly made knowing and

intentional payments to FTOs"; "these payments were intentional and resulted in injuries"; "Defendants intentionally made payments to FTOs"; "Defendants intentionally 'made protection payments'"; "intentionally making payments"; "intentionally paying FTOs money").

That has the law backwards. Texas law does not authorize courts to look for some non-covered theory and "[a]ssum[e]" it controls (ROA.8476). Texas law requires the opposite: look for "*any* allegation in the complaint" that "*potentially*" does meet the definition of "accident," which ends the analysis. *Landry's*, 4 F.4th at 370 (citation omitted). Non-covered allegations "do not negate the duty to defend." *Nokia*, 268 S.W.3d at 496. Moreover, when reading a complaint in this context, a court cannot make the usual assumptions favoring the underlying plaintiff. Rather, the court must draw inferences in favor of *the insured. Lyda*, 903 F.3d at 447; *Gore*, 538 F.3d at 369. Thus, the district court should have looked for allegations that potentially implied accidental conduct—rather than focusing on allegations of non-accidental conduct and "[a]ssuming" them to be dispositive (ROA.8476).

That error clouded the district court's entire analysis. The district court acknowledged that, as Ericsson argued, the complaints "mention" allegations of unintentional, merely "reckless" conduct. ROA.8477. Yet the court brushed aside those allegations as "sparse[]" and "go[ing] to the 'legal theories' involving

21

[Ericsson's] *mens rea*." ROA.8477. But it does not matter whether the covered allegations are "sparse[]." Texas law looks for "*any*" covered allegation—not a weighing of covered versus non-covered allegations. *Landry's*, 4 F.4th at 370 (citation omitted). Moreover, allegations about Ericsson's "*mens rea*" go directly to the relevant inquiry: "whether the injury was intended or fortuitous" from Ericsson's standpoint. *Lamar Homes*, 242 S.W.3d at 9; *King*, 85 S.W.3d at 188. The district court cited—yet set aside—factual allegations about that very issue. ROA.8477 (citing ROA.7502 (*Schmitz* Complaint Excerpts, Ex. 2, App. Supp. Mot. Summ. J.); ROA.7660, 7670-71 (*Wirtz* Complaint Excerpts, Ex. 3, App. Supp. Mot. Summ. J.) (complaint allegations that Ericsson, rather than paying foreign terrorist organizations intentionally, instead "recklessly ignor[ed]" where its money was going and made payments "recklessly" that ended up with foreign terrorist organizations)); *see supra* 8-9; *infra* 26-31, 34-37. Having sidelined those allegations and assumed instead that Ericsson "intentionally" paid foreign terrorist organizations, the district court inevitably proceeded to the erroneous conclusion that the alleged injuries were not caused by "accident." ROA.8477.

That upside-down analysis undermined the very basis of Texas's one-covered-allegation rule. Personal-injury plaintiffs frequently assert alternative theories. They may shoot for the moon with far-fetched allegations of intentional

22

misconduct—while at the same time offering theories of unintentional liability as an alternative. *See, e.g.*, *Nokia*, 268 S.W.3d at 495-96; *Superior Ins.*, 358 S.W.2d at 244. Plaintiffs here deployed that strategy to the extreme, burying Ericsson with thousands of paragraphs of allegations and myriad theories. ROA.5773-6588 (*Schmitz* Complaint) (779 pages, 3,959 paragraphs); *see also* ROA.6590-7260 (*Wirtz* Complaint) (644 pages, 2,702 paragraphs). Insured defendants need to be able to defend against such scattershot strategies. And Texas law ensures that protection by imposing the duty to defend based on any covered allegation and requiring courts to construe allegations in the insured's favor. *Nokia*, 268 S.W.3d at 490-91, 495-96; *Landry's*, 4 F.4th at 370. The district court departed from those rules, so its ruling cannot stand.

## III. Properly analyzed, the complaints here contain allegations that Ericsson caused injury by "accident."

Analytical errors aside, reversal is warranted because the district court's no-"accident" result was wrong. The complaints here—viewed without the district court's erroneous focus on non-covered allegations—allege injuries that were, from Ericsson's standpoint, accidental.

To re-emphasize as an initial matter: The inquiry here focuses on "the insured's view." *King*, 85 S.W.3d at 188-89. The intent of the terrorists who inflicted the tragic injuries at issue here—and of third-party contractors and customers who

23

Ericsson allegedly dealt with—are not relevant. *Id.* at 191-92; *supra* 18-19. All that matters is whether the terrorist attacks alleged were "fortuitous, unexpected, and unintended" from Ericsson's standpoint. *Frederking*, 929 F.3d at 197.

The complaints contain such allegations. The complaints present alternative theories: They sometimes allege (conclusorily and implausibly) that Ericsson deliberately supported terrorists. But they also contain allegations that Ericsson's supposed role in the terrorist attacks was inadvertent. *See, e.g.*, ROA.5880 (¶238) (alleging Ericsson "knowingly (*or recklessly*) paid protection money" (emphasis added)); ROA.6686 (¶237). The latter allegations are crucial here. Allegedly, by conducting "business in, and near," territory "controlled or contested" by terrorist organizations, Ericsson engaged in transactions with third parties that resulted in resources flowing ultimately to terrorist organizations. *E.g.*, ROA.5940 (¶391(c)); ROA.6746 (¶390(c)). And the complaints include allegations that Ericsson was "indifferent to" and "recklessly ignor[ed]" that possibility. *E.g.*, ROA.5897, 5940 (¶¶284(c), 391(c)); ROA.6703, 6746 (¶¶283(c), 390(c)). In short, the complaints include allegations that Ericsson "did not know … where its money went." ROA.5903, 5940 (¶¶295(d), 391(c)); ROA.6709, 6746 (¶¶294(d), 390(c)).

Under these allegations, the terrorist attacks were accidental from Ericsson's standpoint in two independently sufficient ways. First, Ericsson did not intentionally

24

and voluntarily participate in the terrorist attacks or make payments to foreign terrorist organizations. Second, the injuries to the plaintiffs were not the natural and probable consequence of Ericsson's alleged business activity. Any one of these allegations suffices to establish a covered "accident." *See Landry's*, 4 F.4th at 370.

### A. The complaints contain allegations that Ericsson did not act intentionally and voluntarily in causing the injuries.

The complaints contain allegations that Ericsson did not intentionally and voluntarily participate in terrorist attacks or make payments to foreign terrorist organizations. Rather, the complaints allege that Ericsson transacted "indifferent[ly]" or "recklessly" with third parties—who in turn indirectly transferred Ericsson's resources to foreign terrorist organizations that carried out attacks. *E.g.*, ROA.5897, 5940 (¶¶284(c), 391(c)); ROA.6703, 6746 (¶¶283(c), 390(c)). Under those allegations, Ericsson's alleged role in the attacks was unintentional and involuntary—that is, accidental.

1. When the insured acted "involuntarily and unintentionally," Texas law says the injury was accidental. *Wessinger*, 949 S.W.2d at 837; *see, e.g.*, *Acceptance Ins. v. Lifecare Corp.*, 89 S.W.3d 773, 778 (Tex. App.—Corpus Christi 2002, no pet.). What matters is the insured's view of "the injury-triggering event." *King*, 85 S.W.3d at 188. At this stage of the inquiry, the focus is not on whether the insured intended the exact eventual injury. *Discover Prop. & Cas. Ins. v. Blue Bell Creameries USA, Inc.*,

25

73 F.4th 322, 329 (5th Cir. 2023). Nor is it on antecedent events: an insured's conduct is not "intentional" just because it can be traced to an upstream "intentional decision that contributes to an accident." *Frederking*, 929 F.3d at 198-99. Rather, focusing on the injury-triggering event, the question is whether the insured acted deliberately or accidentally. *King*, 85 S.W.3d at 188; *Wessinger*, 949 S.W.2d at 837; *Blue Bell*, 73 F.4th at 329.

2. Here, the complaints contain allegations that Ericsson did not intentionally and voluntarily participate in terrorist attacks—or even "intentionally ma[k]e payments to FTOs," as the district court erroneously held. ROA.8476-77. Instead, there are allegations that Ericsson acted no more than inadvertently: Ericsson "did not know" whether its resources would trickle down to FTOs, "ignor[ing]" and "disregard[ing]" whether terrorist attacks would result. *E.g.*, ROA.5897, 5903, 5940, 5972, 6586 (¶¶284(c), 295(d), 391(c), 489, 3952); ROA.6703, 6709, 6746, 6778, 7258 (¶¶283(c), 294(d), 390(c), 488, 2695). Under these allegations, the alleged injury-triggering event—whether viewed as participating in terrorist attacks or making payments to FTOs—was accidental from Ericsson's standpoint.

In particular, according to the complaints, Ericsson's resources surfaced in terrorist hands indirectly, after "as many as five different companies in the contracting chain." ROA.5868-69 (¶203); ROA.6674-75 (¶202). And the

complaints include allegations that Ericsson did not know whether foreign terrorist organizations lay at the other end of the chain—let alone pay them intentionally and voluntarily. Rather, Ericsson allegedly acted with "indifference to where their money went" and was "indifferent to the funding consequences of its business." ROA.5940 (¶391(c)); ROA.6746 (¶390(c)). Ericsson allegedly "did not know," and "did not care, where its money went." ROA.5903, 5940 (¶¶295(d), 391(c)); ROA.6709, 6746 (¶¶294(d), 390(c)). Ericsson allegedly issued "payments to intermediaries" but "could not determine the ultimate recipients," so "it cannot be excluded that an Ericsson subcontractor engaged in potential illicit financing of terrorism." ROA.5817 (¶22) (alterations omitted); ROA.6624 (¶22) (alterations omitted). Elsewhere, the complaints allege Ericsson leadership authorized payments to third-party consultants while "ignoring red flags" that some money "would be passed to unlawful recipients," thus acting "recklessly" but not necessarily "knowing[ly]." ROA.5897 (¶284(c)); ROA.6703 (¶283(c)).

Even more tenuously, the complaints allege Ericsson, Inc. (a U.S. entity the complaints use as an attempted personal-jurisdiction hook for the whole suit) participated even without being "a party to" the transactions at issue. ROA.5973 (¶491); ROA.6779 (¶490). Simply by being involved with other Ericsson work, Ericsson Inc. supposedly became "a but-for cause" of the complaints' other

allegations. ROA.5973 (¶491); ROA.6779 (¶490); *see, e.g.*, ROA.5974-75 (¶¶495-96); ROA.6780-81 (¶¶494-95). The complaints say Ericsson Inc. "recklessly disregarded"—but may not have known—whether Ericsson resources were linked eventually to designated foreign terrorist organizations. ROA.5972-74 (¶¶489, 493); ROA.6778-80 (¶¶488, 492). These allegations of unknowing, tacit, indirect enablement of distant events amount to participation that was at most inadvertent— not intentional and voluntary.

The complaints also contain specific examples illustrating the unintentional and involuntary role Ericsson is alleged to have played in the terrorist attacks. In one episode, the complaints accuse Ericsson of supporting designated foreign terrorist organizations by doing business with a customer called MTN, even without knowing or intending any downstream link to terrorism. According to the complaints, Ericsson sold network equipment and services to MTN, a third-party telecommunications company operating in Afghanistan. ROA.6023-24 (¶645); ROA.6829-30 (¶643). The complaints allege that MTN (not Ericsson) was pressured by the Taliban to shut off cell towers at night. ROA.6020-21 (¶¶634-35); ROA.6826-27 (¶¶633-34). And in turn, the Taliban allegedly used the shut-off cell

28

towers to aid terrorist attacks by other organizations.[5] ROA.6019, 6023 (¶¶633, 642); ROA.6825, 6829 (¶¶632, 641).

But Ericsson's alleged role in those attacks was (according to the allegations) unintentional and involuntary. Ericsson is not alleged to have shut down any cell towers or coordinated with terrorists (let alone voluntarily and intentionally). The complaints allege only that Ericsson, by working with MTN as a customer, "supplied" "network equipment" and "network development services" to MTN, which enabled MTN to operate its network. ROA.6023-25 (¶¶645-48); ROA.6829-31 (¶¶643-46). This supposedly made Ericsson a "necessary, but-for ingredient" in terrorists' use of MTN's network. ROA.6024-25, 6031 (¶¶647-48, 668); ROA.6830-31, 6837 (¶¶645-46, 666). Yet on the complaints' own account, Ericsson was unaware of its customer's involvement with the Taliban (let alone a designated foreign terrorist organization) even while the cell-tower shutdowns continued for years. *Compare* ROA.6031 (¶668) (alleging terrorists used MTN's towers starting in 2006), *and* ROA.6837 (¶666) (same), *with* ROA.6027-29 (¶¶657, 660, 662) (conclusory statements regarding knowledge from 2010 onwards), *and* ROA.6833-

---

[5] Even that last step requires the complaints to attempt a further causal leap, since the Taliban is not itself a designated foreign terrorist organization giving rise to liability under the Anti-Terrorism Act. *See* ROA.6570 (¶3893); ROA.7242 (¶2636); 18 U.S.C. §2333(d)(2).

35 (¶¶655, 658, 660) (same). According to these allegations, the attacks resulted from downstream conduct by independent actors, not any intentional, voluntary participation by Ericsson.

In yet another example, the complaints allege Ericsson indirectly contributed to terrorist attacks by working "recklessly" with a local shipping and logistics contractor called Cargo Iraq. ROA.5880 (¶238); ROA.6686 (¶237). Ericsson allegedly hired this contractor to transport cell towers and equipment within Iraq. ROA.5918-20 (¶¶348-49); ROA.6724-26 (¶¶347-48). Cargo Iraq allegedly shipped the materials through "areas controlled by local militias, including ISIS" and paid "customs taxes" to those local militias. ROA.5920 (¶350); ROA.6726 (¶349). Some of these "customs taxes" paid by Cargo Iraq allegedly ended up in ISIS's hands. ROA.5920 (¶350); ROA.6726 (¶349).

Yet Ericsson did not deliberately fund ISIS, according to some complaint allegations. Cargo Iraq, not Ericsson, allegedly paid ISIS. ROA.5920 (¶350); ROA.6726 (¶349). And Ericsson did not know that would happen: the complaints contain allegations that Ericsson acted "recklessly" but not "knowingly." ROA.5880 (¶238) ("Cargo Iraq . . . illustrate[s] a broader pattern in which . . . Defendants[] knowingly (*or recklessly*) paid protection money to al-Qaeda-in-Iraq and Islamic State." (emphasis added)); ROA.6686 (¶237) (same). From Ericsson's

30

standpoint, the complaints allege, "it cannot be excluded that" Ericsson's contractor, Cargo Iraq, ended up engaging in "potential illicit financing of terrorism." ROA.5920 (¶351); ROA.6726 (¶350). The complaints thus seek to impose liability based on third parties allegedly directing Ericsson-derived resources to designated foreign terrorist organizations—even if Ericsson did not intentionally and voluntarily send them to foreign terrorist organizations.

Any one of these allegations establishes—and at minimum raises the potential of—a covered "accident."

3. Those allegations belie the district court's statement that the complaints never allege Ericsson made "payments" "involuntarily." ROA.8477 (citing *Blue Bell*, 73 F.4th at 330). That is what all of the allegations above claim. Yet by that point in its analysis, the district court had already erroneously credited the intentional-conduct allegations and sidelined contrary allegations. *Supra* 20-22.

Moreover, the district court erred to the extent it meant to analogize this case to *Blue Bell*. ROA.8477 (citing *Blue Bell*, 73 F.4th at 330). The allegations of unintentional, involuntary conduct here distinguish this case from *Blue Bell*, which involved duties breached "knowingly" and "willfully," with "no" contrary allegations. 73 F.4th at 330. What is more, *Blue Bell* concerned an entirely different theory of injury. *Blue Bell* involved direct injury with no intervening third parties:

The insured corporate directors and officers allegedly failed to stop bacterial contamination in the company's products. 73 F.4th at 330. Those facts shed no light here, where Ericsson's alleged role was indirect—many degrees removed from any injury-triggering event. The district court never even mentioned the multiple alleged layers of intermediaries separating Ericsson and the designated foreign terrorist organizations—let alone reconciled its conclusion with those attenuated, indirect theories.

Finally, if the district court meant that Ericsson transacted voluntarily with *upstream third parties* (like contractors and customers, rather than foreign terrorist organizations), it focused on the wrong event. The question is whether the injury-triggering event, not some antecedent step, was intentional from Ericsson's standpoint. *Supra* 25-26; *King*, 85 S.W.3d at 188; *Frederking*, 929 F.3d at 199. Elsewhere, the district court more appropriately focused on whether "payments *to FTOs*" were intentional (but ignored the allegations indicating they were not). ROA.8476-77 (emphasis added). Asking instead whether Ericsson committed a voluntary, intentional act at *any* point would render this prong of the analysis meaningless. Any accident can be viewed as stemming from some antecedent voluntary act. It is therefore "implausible" to say the conduct was intentional just because the insured at some point "has made an intentional decision that contributes

32

to an accident." *Frederking*, 929 F.3d at 199. Indeed, it is difficult to imagine how a corporation could make an act or omission purely involuntarily—yet the basic premise of commercial general liability insurance is that corporations commit "accidents." Instead, focusing properly on the injury-triggering event, the complaints here include allegations that Ericsson did not intentionally and voluntarily engage in terrorist attacks or make payments to designated foreign terrorist organizations. Unknowing, inadvertent participation in those events makes them textbook "accidents" triggering the duty to defend.

### B.    The complaints contain allegations of injuries that were not the natural and probable consequence of Ericsson's acts.

Even if Ericsson's alleged conduct could be characterized as intentional in some sense, the injuries were still caused by "accident" because they were not the natural and probable consequence of Ericsson's alleged acts. The complaints contain allegations of injuries to plaintiffs so far downstream from Ericsson that they are not an ordinary result of the business transactions Ericsson allegedly made.

1. Even if the "actor intended to engage in the conduct," the "injury is accidental" if, "from the viewpoint of the insured," the injury "would not ordinarily follow from the action." *Mid-Century Ins. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999) (citation omitted). Put another way, the injury is accidental if it is "not the natural and probable consequence of" the insured's act. *Id.* (citation omitted).

33

To be a "natural and probable consequence," the injury must be "obvious[]" and "highly probable"; "mere foreseeability" is not enough. *Frederking*, 929 F.3d at 200. After all, the whole point of insurance is to cover "foreseeable risks." *Lamar Homes*, 242 S.W.3d at 8. So, for example, a "hunter who deliberately fires a gun at what he believes to be a deer but is actually a person" causes injury by accident—even "[t]hough firing the gun was intentional." *Trinity Universal Ins. v. Cowan*, 945 S.W.2d 819, 828 (Tex. 1997).

2. Here, to try to link Ericsson to the plaintiffs' injuries, the complaints allege an attenuated chain of events that is anything but obvious and ordinary. Start with Ericsson's end of the chain. The complaints allege Ericsson Inc., the U.S.-based entity, was somehow responsible for the attacks merely by enabling general "Iraq work" and "recklessly disregard[ing]" downstream consequences. ROA.5972-75 (¶¶489, 493, 495-96); ROA.6778-81 (¶¶488, 492, 494-95). According to the complaints, simply "maintain[ing] an office in Washington, D.C." to "leverage Ericsson's U.S. contacts" was "a but-for cause" traceable to the attacks. ROA.5974-75 (¶¶495-96); ROA.6780-81 (¶¶494-95). But terrorist attacks are not a natural and probable consequence of having a Washington office.

And even as to Ericsson's business operations in Iraq and Afghanistan, the complaints include allegations—as discussed above—indicating that from

Ericsson's standpoint, it was merely doing business with contractors and customers. *Supra* 26-31. Selling services to a telecommunications company, for example, does not have as an "obvious" and "natural" result that someone will commandeer the customer's network to carry out terrorist attacks on Americans. *Frederking*, 929 F.3d at 200; *see* ROA.6031 (¶668) (MTN allegations); ROA.6837 (¶666) (same). Ericsson allegedly "did not know" what would happen to its resources after they passed to third parties. ROA.5903, 5940 (¶¶295(d), 391(c)); ROA.6709, 6746 (¶¶294(d), 390(c)). Rather, the complaints allege, Ericsson was unaware of—and instead "indifferent" or "reckless" to—"the ultimate recipients" of resources that traveled through many layers of intermediaries. *E.g.*, ROA.5817, 5903, 5940, 5972 (¶¶22, 295(d), 391(c), 489); ROA.6624, 6709, 6746, 6778 (¶¶22, 294(d), 390(c), 488); *supra* 26-31.

No less than a hunter unaware of his true target, a company unaware of its resources' ultimate destination has acted by accident. *Cowan*, 945 S.W.2d at 828. Moreover, according to the allegations of indifference and recklessness, the harm would have been avoided if more care had been taken—which is an accident under Texas law. *Harken*, 261 F.3d at 472-73 ("there is an accident" if an act is performed without due care "and the effect is not the intended or expected result had the deliberate act been performed non-negligently"). Thus, the same allegations of

indifference or recklessness discussed above show—when applied to the second prong of the "accident" inquiry—that "from the viewpoint of the insured," injuries to the plaintiffs were not a "natural and probable consequence." *Lindsey*, 997 S.W.2d at 155 (citation omitted); *Frederking*, 929 F.3d at 200; *see supra* 26-31.

Moreover, those consequences are even less natural after considering the many other intervening steps in the alleged chain of events. After resources left Ericsson's hands, it allegedly took the actions of "as many as five" third parties for funds to end up with local cells of terrorist organizations. ROA.5868-69 (¶203); ROA.6674-75 (¶202). From there, the complaints allege, local cells then transferred resources to organizations' central leadership, which then allegedly redistributed resources to other groups, which then allegedly used them to recruit fighters, who then allegedly attacked plaintiffs. *E.g.*, ROA.6005-06, 6013 (¶¶573, 606); ROA.6811-12, 6819 (¶¶572, 605). The complaints allege Ericsson "recklessly disregarded"—and did not necessarily "kn[o]w"—that funds would be used that way. ROA.6586 (¶3952); ROA.7258 (¶2695).

From that attenuated chain, the alleged consequences are diffuse. The complaints try to tie Ericsson to hundreds of attacks over sixteen years in six different countries committed by nine different terrorist groups. ROA.6268-569 (¶¶1226-3891); ROA.7074-241 (¶¶1224-2634). This includes regions, like Turkey,

Niger, and France, where none of Ericsson's alleged conduct occurred. *E.g.*, ROA.6278 (¶1292); ROA.7076, 7078-79 (¶¶1242, 1256-65). And it includes attacks by terrorist groups, like Jabhat al-Nusra, that Ericsson is not alleged to have paid (except that they received funds from other terrorist organizations). *E.g.*, ROA.6445 (¶2781). Those alleged effects are remote causally, geographically, and temporally. The extraordinary line these allegations attempt to trace—from a global company selling products or hiring subcontractors, to terrorist organizations, to later terrorist attacks in another country by other groups—does not amount to a "natural and probable consequence." *Lindsey*, 997 S.W.2d at 155.

3. The district court was thus wrong to conclude that the alleged injuries "'ordinarily follow from or could reasonably be anticipated from' intentionally paying FTOs." ROA.8477 (quoting *Blue Bell*, 73 F.4th at 329).[6] Again embedded in this statement is the district court's erroneous assumption that Ericsson "intentionally pa[id] FTOs" just because the complaints sometimes (implausibly) alleged it. *Supra* 20-22.

---

[6] While the district court quoted *Blue Bell*'s statement of the legal standard (for whether the injury ordinarily follows from the acts), it correctly drew nothing from *Blue Bell*'s facts. ROA.8477. Unlike here, the insured there argued that the complaint *lacked* "enough details" showing the injury was *not* an accidental result. 73 F.4th at 332. This case is not about a lack of contrary allegations. Instead, the complaints here contain allegations affirmatively showing that injuries to the plaintiffs were not the natural and probable consequence of Ericsson's acts.

37

And even on its own terms, the district court's statement is mistaken. That statement, citing nothing in the complaints (ROA.8477), ignores the full scope of inferential leaps between Ericsson and the downstream injuries. It fails to examine those distant consequences from Ericsson's viewpoint. And as a result, it cannot be squared with the allegations showing that attacks on Americans were not an "obvious[]" consequence, *Frederking*, 929 F.3d at 200, of far-removed business activities allegedly conducted "indifferent" to, and not aware of, those remote downstream effects. *E.g.*, ROA.5940 (¶391(c)); ROA.6746 (¶390(c)). Any one of those allegations suffices to establish an "accident" within the duty to defend. *Landry's*, 4 F.4th at 370.

## CONCLUSION AND PRAYER

The Underlying Suits allege an "accident" for all appellants. This Court should reverse the district court's contrary holding and vacate the judgment below (including the grant of summary judgment to the Insurers on the duty-to-defend claims and the dismissal of Ericsson's duty-to-defend counterclaims).

Dated: December 23, 2025       Respectfully Submitted,


*/s/ Ernest Martin, Jr.*
Ernest Martin, Jr.
  *Ernest.Martin@haynesboone.com*
  Texas Bar No. 13063300
Michael F. Qian
  *Michael.Qian@haynesboone.com*
  Texas Bar No. 24146896
HAYNES AND BOONE, LLP
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile:  (214) 651-5940

***Attorneys for Defendants/Counter-Claimants/Counter-Defendants/Appellants Ericsson Incorporated, Ericsson AB, Telefonaktiebolaget LM Ericsson, and Börje Ekholm***

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, I electronically transmitted this Brief of Appellant to the Clerk of the Court of the Fifth Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Ernest Martin, Jr.*
Ernest Martin, Jr.

## ECF CERTIFICATION

I hereby certify that (i) required privacy redactions have been made pursuant to 5TH CIR. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5TH CIR. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Windows Defender and is free of viruses; and (iv) the document will be maintained in paper form for three years after the mandate or order closing the case issues, per 5TH CIR. R. 25.2.9 and 5TH CIR. ECF Filing Standards E(2).

Dated: December 23, 2025          */s/ Ernest Martin, Jr.*
                                  Ernest Martin, Jr.

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that:

1.      This brief complies with the word limit of FED. R. APP. P. 32(a)(7)(B) because this document contains 7,697 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f), and 5th Cir. R. 32.2.

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity A font.

Dated: December 23, 2025

*/s/ Ernest Martin, Jr.*
Ernest Martin, Jr.
*Attorney for Defendants/Counter-Claimants/Counter-Defendants/Appellants Ericsson Incorporated; Ericsson AB; Telefonaktiebolaget LM Ericsson; Börje Ekholm*